and Landon, Consolidated Cases, beginning with 01-16926. The appellant, who is the plaintiff below, Vincent Chieco, my client, won the jury trial, and he was acquitted.  and he was acquitted. obtained a jury verdict of $32,700. Landon doesn't dispute any of those findings in terms of the jury finding of infringement, the jury finding of validity of the copyrights, does not dispute anything other than their cross-appeal is for their fees below. Our appeal has to do with various different things, obviously. The profits issue is one that I'd like to focus on today because your honors have jurisdiction, your honors have discretion to direct a verdict, to reverse the finding of zero profits and to direct a verdict be entered below on the finding of the amount of revenue that Chieco proved was flowing from the infringing streams. The burden under Section 504 of the Title 17 of the Copyright Act places the burden on the plaintiff appellant, in this case, to prove how much revenue flowed from infringing streams. The burden then shifts in the profits context to the defendant to show what expenses are They put on Exhibit 97, they put on the testimony of their CEO, both of which showed that it was a disaster from day one. You're talking about the Willis & Geiger business, Land's End acquiring the Willis & Geiger business and having, according to Land's End, no profits as an overall business. Yeah, but that, I mean, they did meet, they did put on stuff, is I guess what I'm saying. I see. They did put on that. I challenged it on behalf of Chieco throughout the trial. It was almost every time we had a break throughout the record from day one throughout a two-and-a-half-week trial, there are dozens of citations to the record where Judge Breyer kept asking me, where are the profits, where are the profits, where are the profits, I'm not going to let you put on any other witnesses unless you prove where the profits are. And I kept telling him my revenue is just to show expenses, excuse me, revenue. Through Exhibit 97 and through their, I think it was CEO, but anyway, one of their officers, they put on evidence that their costs were excess of revenue. Not with respect. Matched costs to revenue and came up with a goose egg. Not with respect. First of all, Trial Exhibit 97, Your Honor, pertained only to the Internet revenue, which is only half of the two-and-a-half million dollars in revenue that we proved. The other million and a half, million two. Well, it showed for the Internet, it showed a net loss of $159,000. And that was a – Trial Exhibit 97, I stand corrected, was the only thing they did put on with respect to the Internet revenue in terms of so-called specific expenses. But even there, Your Honor, they did not – Trial Exhibit 97 was admitted in violation of Federal Rule of Evidence 1. There was no objection. Whether it was or wasn't, there was no objection to it, and it doesn't seem to me that it's plainly erroneous. Is it? There was no contemporaneous objection to the admissibility of Exhibit 97, at least that I could find. There was no contemporaneous objection. What there was was the judge moved the exhibit in sua sponte while defense counsel was talking about a different exhibit. And I didn't hear the word move for admission of 97. There was no pretrial exchanges, Your Honor. The judge accelerated the trial date by three weeks. And it waived all the pretrial exchanges. So the exhibit list was produced at the same time as the pretrial, which happened just before everything else happened in an accelerated setting. And defense counsel requested, without any showing over my objection, that Chief Financial Officer Hughes of Lanzan be the first witness to go on the stand at the beginning of my case, beginning of Vinicius Chieco's case. He was the first guy to take the stand, very first day of the case. And this was in the whirlwind of the very first day of an accelerated trial, presentation of the jury of an accelerated trial date. So it went in sua sponte. There was no move for admission. There was no – the defense counsel was actually talking with the witness about a different exhibit. And I did not have in my head all the exhibits memorized by number at the time. I didn't know that exhibit 97 was the one when the judge said, okay, trial exhibit 97 is admitted. For all I knew, it was the one that the counsel was talking. This is starting to sound like the dog ate my homework. I mean, it's your responsibility to know what the evidence is that's going in when you're sitting in the courtroom. And if you didn't make a contemporaneous objection, unless it's plain error, you waived it. Well, the district court judges do have an obligation under – The obligation is yours to lodge an appropriate objection to evidence that you deem to be erroneously admitted. Fair enough, Your Honor. You can't just come up on appeal after the fact and say, gosh, I was kind of daydreaming and the defense counsel just blew this one by me or the trial judge slipped it by me. It was not daydreaming. Far from it. It was misled. But the – I did make a motion to strike. It was a week later. And the same thing happened with respect to the evidence that I had admitted. Counsel moved to strike it after the fact, and it got stricken by the judge. He didn't have any problems striking evidence that was before the jury, both written evidence and testimonial evidence after the jury heard it. He did have a problem with the one that I moved to strike. I do believe under Federal Rule of Evidence 1006, Justice Talmadge, that I do believe that the judge does have an obligation, notwithstanding the lack of an objection, to make sure that summary exhibits are – that the underlying records for summary exhibits are produced to the other side. I do believe that's true. Well, but you still have to make the objection. That's the problem I'm having. You've got to do it at a time when the court can correct the problem. If the court agrees with the basis for your objection, that's the way we do it with contested evidence, et cetera. Well, I've just addressed your issue of where was the plain error. I believe it was plain error for the judge to admit a summary exhibit with or without objection, without having any underlying material produced ever in the case. Okay. So even if 97 was admissible, Your Honors, the – there's absolutely nothing even remotely similar to Exhibit – Trial Exhibit 97 with respect to the print infringement revenue that Chieko proved flowed from the infringing streams. And that figure is completely separate from the Internet figure. And that's another – But Hughes' testimony isn't sufficient? No. Hughes did not – That there was never any – never any – that Willis and Geiger had net losses each year of its existence. No, Your Honor. That's not sufficient, because both under the Ninth Circuit cases and under Frank Music I, for instance, and many others, the – and they're cited in the brief, you cannot just look at the company overall. Wilkies v. Santies is another one of the Seventh Circuit. When you're proving revenue under the statute, proving your deductible expenses under the statute, it's not sufficient for a defendant to focus only on the overall profits and losses of the business. You can have all kinds of losses overall in the business. You can have small segments within the company that are profitable. In this case, the print infringement revenue was profitable. At least we proved revenue. Their job was to come back and prove expenses that are specifically related to the production of that income, that income stream. And what they – they didn't do that. And the – they were warned throughout the trial. I kept – I even told the judge at one point. The judge kept asking me, where are the profits? And I said, I don't want to – I don't want to explain it right now, because they'll change their evidence. They hadn't finished putting on their evidence. And he said, so what? Maybe they will meet what you have to say. And so I went ahead and said it. And this comes in the issue – this comes up in the issue in the context of the Rule 50 issue, that I went ahead and explained everything in terms of why they have – why they have not – why the overall – the proof of overall revenue – excuse me, Your Honor. The proof of overall expenses of the company as a whole is not sufficient. And they did nothing to correct that. Okay. With respect to the license fees, there's a number of different errors – a number of different errors alleged with respect to the license fees. The jury awarded zero for hundreds of infringements over a four-year period of time. And the $32,700 only went to the last two books out of dozens of books that Vinnie Chico wrote over a four-year period for Willis and Geiger. Over that period of time, they paid him several hundred thousand dollars for his writing, for his brand creation, for his creation of the brand. They also had a written contract that they would not use the materials that he wrote with respect to the descriptions in these books until – you know, without – in any other context other than the Willis and Geiger books without further negotiations and further compensation. As they signed that contract, they were doing just exactly that. They were putting it on the Internet and they were putting it in the broadsides and they were putting it in the stuffers. They were infringing in at least three different contexts in the exact same time that they signed the contract which memorialized what it was that they had done in the past and what it was that they would do in the future. There's a number of errors assigned in the briefs to the licensing issues, which in my estimation were preempted by the Copyright Act, which is why the contract claims were dismissed, withdrawn, just before we went to jury. And what I really want to urge upon Your Honors is that if, in fact, the measure of damages under the Copyright Act does not allow for at least as much as the contract would have allowed, then I would request permission to retry, to have the case remanded because the cases were not clear at the time that the contract issues were withdrawn. Cases were not clear that the extra element, there's a preemption issue under 106 of the statute, of the Copyright Act, and the Copyright Act preempts everything and many, many contract cases in the Ninth Circuit that have been preempted. Recently, there's been a case just this month, Grasso or Gasso. That's an implied contract, isn't it? Oh, right. The Wilder claim, though. That is an implied contract. Thank you, Your Honor. But to the extent that the promise to pay that is in the contract is considered to be an extra element such that it's not preempted, out of fairness, we really should be able to try the contract case. But I would argue that the contract issues in this case were preempted because the Copyright Act covers infringements. It covers alterations of copyrighted material. It covers compensations under the buyer-willing-seller hypothetical retroactive negotiation. And in this case, the evidence is such that the big challenge here on a ñ there's a number of different challenges, including instructional, but I want to focus right now, unless Your Honors have any specific questions, I want to focus on the expert, the admission of the expert testimony by the defense. The expert ñ there was a ñ there was a challenge made to the expert before the expert went on stand. The judge ignored. Let me go to the expert. Perhaps not ñ could you just indulge me for a second? Yes. As I understand it, on the statutory damages, the jury is allowed to give from $500,000 to $20,000 per work. All right? There were two works involved here because there were only two that were duly registered. They gave $32,700. That gives almost ñ well, $16,000 apiece. What's wrong with that? There's ñ we're not challenging the amount of statutory damages that the jury awarded with respect to those two works. And on the actual damages, the jury can disbelieve your witness, who was your only damage testimony. Right? They can say that she overreached. She was outrageous. She was too high. We just ñ we're allowed to disbelieve her for any grounds. That's what the instruction gives. Why can't the jury just disbelieve your witness without having to believe Mr. Lind or Dr. Lind? Is that a sufficient ground? Well, assuming the jury did believe that there was overreaching involved, that does not support a conclusion that zero damages are awarded for the remaining hundreds of infringements that don't qualify for statutory damages. She has the burden of proving, and she asked for $1,000,009, and they roll their eyes and they say, we don't believe $1,000,009, and we don't believe ñ there's no other evidence as to what it should be. Next. Why can't they do that? Because, Your Honor, the evidence was that the vice ñ that the President of Willis & Geiger admitted that he did not ask Vinnie Chieco to write the infringing copy that, in fact, Burt Avedon bidded himself. That goes to liability. The question goes as to damages. Because if he asked him, Vinnie Chieco would have asked for too much. The President of Willis & Geiger said we didn't ask how much he wanted because he would have asked for too much. When the evidence ñ the evidence that the Court excluded, which was also an assigned error, is that the industry practice is such that when you have an exclusive right to use copyrighted material in one context and you pay for it, and then you take it and use that material in a separate context, that there's a multiplier that's applied. You only get 100 percent of what you got the first time, but you get a multiple of that, and the multiple ranges from one to ten. And the judge absolutely refused to let me get into the jury's hearing any evidence other than Mr. Chieco's own testimony of what his state of mind was with respect to what these industry witnesses told him when he put together his bill when Lands' End said, send me a bill, you're right, we've infringed. So one of your specifications of errors is that Judge Breyer did not let you prove that a multiplier of one to ten of the actual amount paid to the copywriter was the proper amount of actual damages? That's right, Your Honor. Is that argued in your brief? Yes, it is, and there's also an extensive declaration by Grant Richards that's attached to the new trial motion that's also in, I believe it's at 159, tab 159 of the record, where Grant Richards went through and says how many different things he would have testified to, and the judge from day one absolutely refused to let me get Richards in either as a lay witness, based on his own personal experience in the industry, or as a, not just as a precipient lay witness, but as an opinion lay witness. And then as a last resort, I made a motion for a late designation of an expert, and he denied that as well. And yet, at the same time, I have to explain that the formula that Vinnie Chico used to get to his 1,000,009 figure, the 400 items, times the amount that he had been paid in the past for each item, 1,200 per item, times a multiplier of three, that's how he came up with the figure of 1,000,008, that same formula was used by the defense expert. He just plugged in different figures. And his figures are not supported by the record. Vinnie Chico's figures in that formula are supported by the record, and that formula is well accepted in industry practice. Kennedy. Who was your, I must admit, what was the name of your expert who you proffered to give testimony as to the custom and practice of the advertising industry paying a multiple of what was originally paid, the copywriter, when the copy was used without permission? Grant Richards was one of them. And when did you designate Mr. Richards? He wasn't designated as an expert originally. He was identified in the deposition as one of the individuals to whom Vinnie Chico spoke in order to come to an understanding of what a proper license. The district court refused to permit Mr. Richards to testify because he didn't comply with the discovery rules? He initially, with respect to the expert, that's true. With respect to him as an expert, I wasn't presenting him as an expert initially. I was presenting him as a precipient witness based on his observations in the industry, and he was identified in a deposition early on in the case. Judge Breyer allowed the CFO of Land's End, Hughes, to testify based on his experience, give opinion testimony as to his experience. Has Hughes been designated within the time frame? No. No. What I'm saying is that he allowed Land's End to put on witnesses to give opinion based on their experience. Oh, I see. I see. It was Land's End that was designated as their damage. Is that correct? Correct. And the very same, but he absolutely refused to allow me to put on anyone to testify as to, based on their own experience. So when he wouldn't let him in as a precipient witness, I said then as an opinion of a layperson, and he wouldn't let that happen. Just a second, counsel. Of what relevance would it be that, is it Grant Richards? Yes. Grant Richards had personal experience of what was paid unless he were willing to state that, in his opinion, that was an industry standard applicable to this transaction. The foundational testimony by the so-called expert witness of what he has observed is irrelevant to this controversy unless it's accompanied by valid expert testimony that such was a custom and practice of the industry. Isn't that so? And what you're saying is that Grant Richards wasn't properly disclosed and therefore was kept out. What you were trying to do is a backdoor expert testimony in as based on what the witness observed. But what the witness observed was irrelevant to the formulation of an industry standard without him qualifying as an expert witness. Isn't that true? I don't think that's true, Your Honor. I believe, for instance, I don't think that's true. I think that industry witnesses can get on the stand and testify about what happens in the industry without being designated as expert witnesses. For instance. Oh, you do. Doesn't he have to also give the opinion that that is the industry standard? Isn't that an opinion? That is an opinion. And in this case, it's a lay opinion. It's not an expert opinion. And it was excluded. I'm out of time, Your Honors. I wanted to reserve some, but I wasn't able to. If you have any other questions, I'll be happy to answer them. You still have a tiny bit left. Excuse me? You still have a tiny bit left. Okay. I'll reserve that then. Thank you. Mr. Willis. Good morning. I'm Jeff Willis. I represent Land's End. With me is my colleague, Wendy Neal. Let me address first the proof regarding the so-called profits issue and the fact that the jury returned with a zero verdict, even though they found that there had been infringement, at least in two instances. The only evidence that the jury had before it regarding the elements of profit really was the uncontested testimony of Mr. Hughes, who was the chief financial officer of Land's End at the time, and Exhibit 97. Exhibit 97 was probably superfluous in light of the testimony of Mr. Hughes, but it was not something that was first exposed in the trial. In fact, Exhibit 97 was an exhibit to Mr. Hughes's deposition taken earlier. It was also attached as an exhibit to a motion for summary judgment filed by Mr. Chieco prior to the trial. So the summary, if you will, of the costs and expenses associated with the liquidation of certain of the Willis and Geiger products was well known to all parties long before the jury was convened on August 7th. Mr. Willis, counsel complains that under Rule 1006 that the documents that supported Exhibit 97 were not produced or made available during discovery. Did she ever ask for them? I am unaware of any request that the underlying data be produced. I think, as Mr. Hughes testified, Willis and Geiger at that time or, excuse me, Land's at that time and today is electronically equipped to create its financial records. But as Mr. Hughes testified, they are done according to GAP. It was a public company. It was audited every year by outside auditors. And the integrity of the data is really not subject to question. But specifically, no, I am unaware of any request during discovery, either formal or informal, to produce the underlying data, even assuming it would have been more than just computer printouts. I understand that Ms. Brown also suggests that the testimony in Exhibit 97 failed to allocate overhead costs to the Internet and to the print use of the works. I guess I would disagree with first the statement. But I think it's a moot point because we demonstrated through Mr. Hughes' testimony and also through Exhibit 97 that the cost of goods sold and the variable costs of actually moving the Willis and Geiger products during the liquidation cycle exceeded the revenues that were realized. And so the inquiry really stops there. And as I understand the role of overhead in this case, the role of overhead may or may not be appropriately deductible as an expense, depending on the willfulness of the infringement. Here, Lanzin was found not to have infringed willfully, so that if the overhead figures are, in fact, added on, it simply makes the loss greater. It does not change the number from red to black. And as I think Mr. Hughes testified, it's almost a point of obviousness that if you're in a liquidation situation, dealing with retail products, what you're trying to do is minimize your loss, not make a profit. And Lanzin is no different than any other entity in that regard, except that perhaps it's a little more successful in reducing its loss. But there certainly was no demonstration that it was profitable in response to Mr. Hughes' testimony. And in fact, logic, we submit, would support the proposition that you do not make money on that type of operation. Unless there are further questions on the profits issue, may I? I'd like to address the license fee or the actual damages. The jury returned a verdict of zero for actual damages, even though they found some infringement. But this is not that surprising, because the jury was aware at the time it retired that the burden of proof to establish the actual damage is rested upon the plaintiff. The evidence that they had before them in the form of testimony from Mr. Chieko was that his opinion of the loss was almost $1.9 million. But even on direct examination and as confirmed in Cross, this was simply a number that he had to be charitable manufactured, such that had a hypothetical negotiation occurred, this is what he would have demanded. His testimony was unequivocal that he did not want to license the copy to Willis & Geiger or Land's Inn to be used on the Internet, and therefore he would pick this number knowing that it would not be acceptable. Well, that really isn't evidence of value. That isn't evidence as to whether or not the fair market value of the copyrighted material has been reduced because of the infringement, nor is it evidence of what Mr. Chieko could have expected to have received for the copyrighted material on the open market or through an arm's-length transaction. The fact of the matter was, and as he admitted, this copy had value only when it was associated with a particular clothing product that was being marketed by Land's Inn. It could be the finest piece of literature in the world describing a bomber jacket, but it's still describing a bomber jacket, and it's not going to go anywhere unless you're selling the bomber jacket itself. So that was the only evidence that was before the jury as to value, and I believe, Your Honor, as you recognize, the jury was free to ignore that evidence as being evidence of value. That was certainly within their province. Dr. Linde, which a witness presented by Land's Inn, testified that in his estimation and these are rough approximates, that had a hypothetical negotiation occurred that Mr. Chieko may have expected to receive somewhere between $3,000 and $32,700 for the later use of the product. Now, the jury did not accept this as evidence of the actual damage suffered by Mr. Chieko because they awarded zero in that category. But again, the burden of proof on this issue was with Mr. Chieko, not with Land's Inn. Land's Inn offered this testimony as an alternative to what Mr. Chieko was saying, but because it was Land's Inn's expert, the jury was under no compulsion to accept any opinion of value that he may have offered. Interestingly, though, the jury did award $32,700 as the statutory damages for the infringement of the two works that were registered within the time frame to provide for statutory damages. And I would submit that this is actually a triumph of the jury system, and you had the jury attempting to be fair to Mr. Chieko, recognizing that his burden of proof had not been fulfilled, but at the same time, awarding him in statutory damages the only competent figure that had been provided in the record of actual loss. Sir, how do you handle the objection raised in this appeal that Judge Breyer had submitted to him, a motion to keep Professor Lind off the stand as being unqualified to formulate an opinion, which motion was never ruled on? Secondly, when the plaintiff sought to voir dire Dr. Lind, that was denied. Where is the ruling on Dr. Lind's testimony in fulfillment of what the Supreme Court tells us should be the district court's gatekeeper responsibility under Dobert and Kumrow? I'm not as sure there was any express ruling other than those or that to be found in the judge's comments immediately before Dr. Lind was sworn in to testify. But may I submit, Your Honor, that to the extent that there may have been some procedural irregularity, that it was harmless, because Dr. Lind was clearly competent to testify. He's got a doctorate in economics from the University of California. At the time, he was the PricewaterhouseCoopers partner in charge of their intellectual property valuation practice in the Western United States. He has been qualified to testify in numerous courts, both State and Federal, on these subjects. So to the extent that there had been any properly made motion under Daubert measuring his qualifications and his testimony against that test, he passed with flying colors. Well, didn't counsel file one in the form of a motion in limine filed on August the 17th, which I believe was a Friday? And I guess the question I'm having, to follow up on Judge Baez's question, the problem I'm having is I looked at the record, and the only thing I can find in the record is the court basically says, I'll take the motions under advisement, and then on Monday morning, when you call Dr. Lindy, Dr. Linde, counsel for Mr. Chieco states on the record where the court says something to the effect of, you know, I've already handled that or something. She says, understood, but the motion pending has already been ruled on. Was there something that happened in between Friday and Monday that the court reporter didn't pick up with regard to this motion in limine? Your Honor, I'm not aware of anything specific that may have missed. I guess when we called Dr. Linde on the following day that the – I'm sorry, it was on the Monday. Monday, yeah. We certainly were under the impression that the motion in limine had been denied. And I cannot tell you whether or not that was because Judge Breyer specifically stated from the bench that that was the case or whether or not – Well, if he did, the court reporter didn't pick it up because it's not in the transcript. Although there does appear to be in this sort of elliptical statement by Ms. Brown an acknowledgment that the motion had been ruled on. So where did – I mean, you were at trial, too. Yes, I was. I assume you were paying attention, perhaps more so than opposing counsel at times. But what happened? I'm at a loss here as the appellate judge trying to figure out where it went. May I have a moment? Sure. Your Honor, I'm afraid that we can't be of any assistance to you to locate something specifically in the record where the words, I consider the motion and it's denied, appear. Did you file a response to the motion? I don't believe we did. I think it was filed, what, on the Friday and then we showed up on Monday. And I would submit that, one – well, I would submit, one, that if the motion was properly and procedurally properly in front of the court, that it should have been denied under all circumstances, whether we filed a response or not. Even if I were to agree with you, how can you help me get over our decision in Mukhtar v. Cal State Hayward, where we said that in the performance of the district court's gatekeeping function, the trial judge has to make a specific reliability determination where there's a challenge made to the competency of a witness to offer an expert opinion? Well, I believe that if you would review the transcript of the proceedings that occurred while Dr. Line was on the stand, both immediately before, during, and then immediately after, that effectively the judge made comments to the effect that he believed that Dr. Line was competent to testify in this area. But, again, I cannot point you to anything where Rule 104 is referenced and Daubert is cited and there is such a finding. I would suggest to you, though, Your Honor, that whether or not the gatekeeping function was documented, it did occur. And whether or not it should have been documented would, to me, again, be harmless error because obviously nothing Dr. Line said went to the detriment of Mr. Chieko. They didn't accept his number for actual damages any more than they accepted Mr. Chieko's number for actual damages. They accepted his exact number and styled it statutory damages. That's correct. And there wasn't any testimony as to statutory damages. That's also correct. Is there ever? I was going to say, I was trying to imagine a situation where you would be, but I mean, the statutory damage range goes up to $20,000 and you've got about 70-some percent of the maximum. That's pretty good. And that's just a discretionary call, right? You don't put on evidence to justify. I'd like to come back to the point at the beginning, and this, I guess, ties in with your argument that this was the jury at its finest. Yes, sir. All right. If there are no further questions on that, I would like to move. I do have a question as to Dr. Line, and help me with this if you would. I agree that the University of California at Berkeley is a magnificent institution, although I didn't happen to go there. But, and the Price Waterhouse has one day a year when they open envelopes, which really gets them on in everybody's eye. But what was Lin's scope of expert testimony? What was that testimony which was so far away from the kin of the jury that expert testimony was needed? What was he testifying to? He was testifying as to the you're familiar with the concept of the hypothetical negotiation, which I think arises more in patent cases than it does in copyright cases. But the principles still apply, and I believe Ms. Brown, in her brief, drew comparisons between the Panduit case, which was patent, and the current situation. Dr. Line was charged with the assignment of determining objectively what the range of value would be for the copyrighted material. And that is what he did, and that is what he testified to. Which range of value for the copyrighted material, which he testified, I have a high and low range, depending on a judgment as to the comparable worth of placing the ads on the internet, as opposed to putting them on the very high volume print ad print catalogs, which are Land's End's main means of reaching that clientele. Right? Yes. So the low end is simply a 50% equivalent rate to what, he doesn't say. And the high is 100% equivalent rate to the rate that already was paid for the catalog ad copy. So I take it what he's saying is, if Kieso was paid $1,200 for a piece of ad copy, if it went to the internet, he should get $600. If it went to the print, it should get $1,200. Right? And where does he get that? Well, he got that, I think, as he further testified, and I'm – I think what he said is, is that he used the – he extrapolated the per-piece work cost of what had been produced. $1,200 is per-piece work, right? And then said if it's used in the internet, if there's going to be subsequent use of the copy on the internet, as opposed to the print media, that in his experience in dealing with this industry, that 50% was a supportable percentage of the print – the originally contracted for print price. If it goes on the internet. If it goes on the internet. And if it goes in the publication, it should be 100%. It could be. I think that's what he said. It could be 100%. Yes. Therefore, why isn't that good testimony for the plaintiff's position that maybe she should get $900,000 if it all went on the internet, and $1,008,000 if it all goes in print? I don't think we ever suggested that it wasn't. I'm not sure that the jury just didn't believe it. Right. Right. You have to understand that what we're talking about here is it's advertising media, and the advertising media is for particular specialty products. I don't know whether you have any familiarity with Willis & Geiger, which doesn't exist anymore, but it was like Jay Peterman on a much lesser scale, and it had some very snappy copy describing bomber jackets and vests, and, you know, even at the trial we had specific items of clothing that the jury could look and touch and feel. But the copy has no value whatsoever without the bomber jacket or without the other item of Willis & Geiger clothing or Willis & Geiger product. So it's, again, as a matter of logic, not surprising that the jury would conclude this really wasn't worth anything. I mean, it was so specialized and so focused that it wasn't worth anything on the open market. But, again, reflecting, I think, the wisdom of the jury, they did their best to give him an amount that they believe was credible, which was Dr. Lines' testimony, that may have represented his loss. They were unwilling, obviously, to give him what he was demanding, the $1.9 million. Which, in the context of the relationship, was a very difficult figure to sustain because Land's End had paid Mr. Chieco $290,000 to create it in the first instance. And, again, it was copy that had value only when associated with a product that was owned and sold by Willis & Geiger. And Dr. Lind was testifying that, from his experience, when copywriter work is infringed upon, then the custom and practice is to pay 50% of the original payment to the copywriter if it goes on internet and 100% if it goes in print. I'm having difficulty with that. I'm having difficulty with the idea that we have a damages expert. Of what relevance would it be in a slip and fall case for saying a broken ankle usually goes for $10,000 and, therefore, that's what this individual should get? Would that be allowed? No, it wouldn't. And that's not what he testified to. What he testified to wasn't assuming there has been infringement, what would the plaintiff settle with the defendant for. That wasn't what he testified to. He testified to assuming that before infringement there had been some effort to negotiate a contract for continued use. And this is what the fair value rate is. The test here is an objective test, unlike a broken ankle. That's correct. That's correct. Thank you. I think your time is up. Thank you very much. It's up. Ms. Brown. Yes, thank you, Your Honors. I'll just quickly address First Justice Talbot's point about the already-been-ruled-on with respect to the Talbot or the Dalbert motion. And what motion were you – is that what you were referring to when you said that? Yes, but I didn't say that. I said it has not yet been ruled on, but the transcript is different from what I said. So that's – if you read the context in which that comes up, it doesn't make any sense for me to say – Yes, but what can I do with that? I mean, now you're telling me that I can't rely on the transcript. You didn't file a motion to correct the record on appeal. I mean, I don't know what to do with a statement like that. Okay. The answer is you will not find anywhere in the record a ruling on that motion because there was none. All right. Okay. Thank you. And with respect to the jury being free to ignore Mr. Chianco's testimony with respect to his own value, his own opinion as to the value of the material, Justice Beyer, he – the jury wasn't free to ignore it in so much as they were instructed to ignore it by the judge. When Judge Breyer finally let me, he was even not – he was even going to deny Chianco's own opinion as to value, which is always admitted in an intellectual property case. When it did finally get admitted, he did – You're saying that Judge Breyer gave a peremptory instruction to the jury to ignore the plaintiff's testimony as to damages? In so far as Mr. Chianco was explaining from his state of mind, the people that he talked to, to get an understanding as to industry standards – Can you give me a record citation to that peremptory instruction, if you please? Yes. It's – Are you talking about the colloquy on the reasonable fee, or are you talking about something else? That's something else, Your Honor. That's also an objection in the issue. But what happened was he was – he was supposed to be giving a limiting instruction with respect to the hearsay aspect of Mr. Chianco's discussions with people in the industry, including Grant Richards, and how Mr. Chianco came up with the formula that he presented in his bill to Lansdane when Lansdane asked for the bill for the infringements. So Judge Breyer did give what – I don't have a problem with the judge giving a limiting instruction with respect to hearsay evidence that was I do have a problem with the way the judge phrased it, which was he said to the jury, just as we got to that point of Mr. Chianco's testimony, he said, now, you cannot give this testimony any weight at all. He didn't – he didn't give a limiting instruction. He gave a nullifying instruction. So the jury was not just free to ignore it. They were instructed to ignore it, and that's also an error that's assigned in the briefs. Ms. Bray, you're now way over time. And thank you. The matter just argued will be submitted. Appreciate it. Thank you, Your Honor. The Court's going to take a very brief recess before hearing the final matter on calendar.
judges: Rymer, Tallman, Bea